UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY TORALBA,<br><br>    Petitioner,<br><br>    v.<br><br>G. GIURBINO,<br><br>    Respondent.<br>_____/ | CV F   06-00967 OWW DLB HC<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |

    Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

<u>RELEVANT HISTORY</u>

    On January 26, 2004, following jury trial in the Kern County Superior Court, Petitioner was convicted of selling cocaine (Cal. Health & Saf. Code § 11532), and conspiracy to sell cocaine (Cal. Penal Code[1] § 182(a)(1)/Cal. Health & Saf. Code § 11352).  The jury also found true the allegations that Petitioner sold the cocaine for the benefit of, at the direction of, and in association with a criminal street gang (§§ 186.22(d), (b)(1)).

    On March 1, 2004, Petitioner was sentenced to a total term of seven years in prison.  (CT 130-131, 211.)

    Petitioner filed a timely appeal in the California Court of Appeal, Fifth Appellate District.  On February 9, 2005, the Court of Appeal affirmed the judgment in an unpublished opinion.

---

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

(Lodged Doc. No. 4.)

On March 9, 2005, Petitioner filed a petition for review in the California Supreme Court. The petition was denied on April 13, 2005. (Lodged Doc. No. 5.)

Petitioner filed the instant petition for writ of habeas corpus on June 27, 2006.[2]

Respondent filed an answer to the petition on November 21, 2006. (Court Doc. 9.) Petitioner did not file a traverse.

On January 4, 2008, the Court directed Respondent to submit supplemental briefing addressing the impact of the Ninth Circuit's opinion in Kesser v. Cambra, 465 F.3d 351 (9th Cir. 2006). (Court Doc. 12.) Respondent filed a supplemental brief on February 4, 2008. (Court Doc. 14.) Petitioner did not file a response.

## STATEMENT OF FACTS[3]

On June 13, 2003, Bakersfield Police Officers Bryon Sandrini and Jay Wells responded to a call that people were loitering around a market and refusing to leave. Officers Sandrini and Wells drove to the market and parked about half a block up the street. From this vantage point, the officers observed between eight and twelve people loitering around the market. Through an informal investigation by Bakersfield police over a three to four month period, police learned a group of people had been loitering around this market on nearly a daily basis. Since the police had been getting calls about people loitering about the market and other locations, Officer Sandrini brought his personal video camera to surreptitiously tape the group.

The seven-minute videotape was played for the jury.[4] The videotape showed a police motorcycle driving by the group. The group appeared to look toward the motorcycle to see where it was going. Subsequently, a marked police car drove by the market. As it drove by, one of the group members turned toward the store and yelled, "Hey, rollers." The videotape also depicted a person with a long ponytail, identified as [Petitioner], contacting a man, identified as Marvin Roberson. [Petitioner] was seen reaching into his mouth as if to retrieve something. [Petitioner] then apparently handed Roberson the item, while in turn Roberson appeared to hand [Petitioner] something which looked like money. Roberson rode away on his bicycle. Officer Sandrini directed Officer Wells to contact Roberson. Officer Wells returned to the patrol car and followed Roberson. Roberson was slowly riding his bicycle while talking to a woman

---

[2] The petition was initially filed in the United States District Court for the Southern District of California. The petition was transferred to this Court and filed on July 25, 2006. (Court Doc. 1.)

[3] The Court finds the Court of Appeal correctly summarized the facts in its February 9, 2005 opinion. (Lodged Doc. No. 4.) Thus, the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District.

[4] The trial court described the tape's audio quality as "very poor." Accordingly, there was no transcript created for the audio portion of the tape.

walking near him.  Officer Wells approached Roberson.  A subsequent pat search of Roberson did not reveal anything.  Officer Wells arrested Roberson for loitering for narcotics activity and told him he just observed a narcotics purchase.  Officer Wells did not search the woman because he felt he did not have legal cause to do so.

Meanwhile, Officer Ryan Slayton, a member of the Special Enforcement Unit which polices street-level, gang-related crimes, detained Terrance Brown, Terry Herron, and David McMillon, who were walking away from the market.[5]  Officer Slayton ordered the men to sit on the curb; as Brown sat down he dropped into the gutter a plastic baggie containing 23 bindles of rock cocaine, which were later determined to weigh a total of 6.5 grams.  At trial, Officer Slayton identified [Petitioner], Brown, Herron, McMillon, Lloyd Killebrew, Jermaine Wommack, and George Sutton in the videotape.[6]  Officer Slayton recognized them from prior contacts.

Officer Slayton interviewed some members of the group seen loitering in the videotape, whose statements were admitted at trial for the limited purpose of developing evidence for the gang expert's opinion.  Officer Slayton asked Sutton what he knew about the activities going on in front of the market.  Sutton initially said he didn't know anything about it.  When told he was on the videotape, which showed him near where a drug sale took place, Sutton replied "'Can't stop another man from selling.'"  Sutton added, "'It's none of my business what he does.'"  Sutton admitted being affiliated with the East Side Crips gang.  When arrested, Sutton had $101 in various denominations, which is consistent with sales of small amounts of cocaine.

Officer Slayton interviewed McMillon and Herron, who both denied involvement in drug sales.  Both identified [Petitioner] by the moniker "Asian," admitted affiliation with the East Side Crips, and told Officer Slayton everyone standing outside the market was an East Side Crips gang member.  When interviewed, Brown initially said he walking [sic] down the street to get a soda, but admitted being in front of the market after being told about the videotape.  When Officer Slayton told Brown the videotape showed him standing next to [Petitioner], who was selling drugs, Brown denied knowing drugs were being sold.  Brown admitted affiliation with the Mid City Crips gang.

Officer Slayton also interviewed Wommack, who denied being at the market until he was told about the videotape.  When confronted about being [Petitioner's] lookout, Wommack replied, "'Man, I can't stop that man from selling his dope.'"  Wommack was affiliated with the East Side Crips gang, but claimed he was no longer an active member.

Officer Slayton detailed how gang members sell drugs as a group activity.  He explained that one person will carry the money, another will carry the drugs, another will sell the drugs, and another will act as a lookout.  In this manner, if the police contact one member, the rest can usually get away and they don't lose everything.  The seller commonly carries bindles of the drug in his mouth so he can swallow the contraband if police or anyone else comes.  Officer Slayton explained that "rollers" is a street-level slang term for police, and yelling "rollers" gives "a heads up to the other people involved in the sales that police are coming."  According to Officer Slayton, there had been a high number of drug sales and gun-related arrests in the area around the market.

After reviewing the videotape, Officer Slayton opined the activity was

---

[5] [Petitioner] was not contacted that day.

[6] McMillon, Herron, and Wommack were also charged, but were tried separately from [Petitioner].  Brown was named as one of the conspirators in count 2 as it relates to a charged overt act, but was not charged.

consistent with a group-related drug sale operation, even though he couldn't see any actual drugs on the videotape. Officer Slayton testified that almost everyone on the videotape was wearing common attire for the East Side Crips consisting of a white tank top or t-shirt, and blue jeans or black pants. He also opined the group was loitering for the purposes of narcotics activity. Officer Slayton testified [Petitioner's] videotaped conduct with Roberson was "pretty much a textbook hand-to-hand transaction" in drug sales. A photograph of [Petitioner], Leon Anderson, Diante Nettles and Sean Powell showed at least three of them, including [Petitioner], making the letter E with their hands, which is consistent with the hand sign for the East Side Crips gang.

    Officer Martin Heredia, a member of the Special Enforcement Unit, testified about gang activity in Bakersfield. Officer Heredia testified the East Side Crips was an active gang in Bakersfield on June 13, 2003, which had been involved in murders, attempted murders, drive-by shootings, robberies, burglaries, car thefts, witness intimidation, and drug sales. Officer Heredia testified about two prior crimes committed by the East Side Crips. One crime involved an East Side Crips members, Terry Turner, who threw away a firearm while fleeing from police who were conducting a parole search; a later search of Turner revealed he was carrying cocaine base. In the other crime, Nettles sold drugs to a police informant. According to the informant, [Petitioner] assisted Nettles in the drug transaction by ordering the informant to stay at a particular location where the transaction occurred.

    Officer Heredia opined Nettles, Brown, Herron, Wommack, McMillon, Sutton, Killebrew, and Curtis Moore were active East Side Crips gang members. The officer opined [Petitioner] was an active East Side Crips gang member based on his association with other gang members, photographs depicting [Petitioner] making gang hand signs, and his jail booking information evincing gang affiliation. Officer Heredia believed [Petitioner] went by the moniker "Moe" or "Asian." Officer Heredia explained that drug sales benefit a criminal street gang by providing financial support for the gang to allow it to purchase weapons, cars, food, clothing, etc. Based on the activities depicted in the videotape and other trial evidence, the officer opined the current offenses were committed for the benefit of the East Side Crips gang.

(Lodged Doc. No. 4, Opinion, at 2-6.) (Footnotes in original.)

## DISCUSSION

A.    <u>Jurisdiction</u>

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v.

5

Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993). In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.     Denial of Batson/Wheeler Motion

Petitioner raises the single claim that the trial court violated his Sixth and Fourteenth Amendment rights when it "summarily denied his Batson/Wheeler motion without affording [him] the opportunity to state his prima facie case." In addition, the motion was improperly denied because the trial court failed to inquire into the prosecutor's explanation for the dismissal of prospective juror "Mr. Kelly." (Petition, at 6.)

Initially, the Court notes, as does Respondent, that although Petitioner challenged the prosecution's exercise of peremptory challenges as to both African-American jurors who were excused from the jury panel in the petition filed at the Court of Appeal, Petitioner only raised his Batson challenge as to Mr. Kelly in his petition for review to the California Supreme Court, therefore any challenge to other panelists is not exhausted, and will not be reviewed.[7]

In denying Petitioner's claim on direct appeal, the California Court of Appeal held, in pertinent part, as follows:

> After the court excused three of the original twelve prospective jurors for cause, Mr. K. was called to the jury box. When questioned by the court, Mr. K. replied he was an assistant principal at an elementary school and his wife was a school teacher. He had served as a juror two years before in a criminal trial, and had family friends in law enforcement. When questioned by the prosecutor, Mr. K. denied having negative experiences with law enforcement or any problem with the concept of reasonable doubt. When questioned by defense counsel, Mr. K.

---

[7] A petitioner who is in state custody and wishes to collaterally challenge his conviction by a petition for writ of habeas corpus must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations. Coleman v. Thompson, 501 U.S. 722, 731, 111 S.Ct. 2546, 2554-55 (1991); Rose v. Lundy, 455 U.S. 509, 518, 102 S.Ct. 1198, 1203 (1982); Buffalo v. Sunn, 854 F.2d 1158, 1163 (9th Cir. 1988). Exhaustion requires the fair presentation of claims to the highest state court, i.e. the California Supreme Court. Jackson v. Cupp, 693 F.2d 867, 869 (9th Cir. 1982). Because Petitioner did not challenge any other juror panelists beside Mr. Kelly, any such challenge is unexhausted and not cognizable.

explained he had no experience with drugs or gangs in his school, and could put any feelings against drugs and gangs aside and give both parties a fair trial. The prosecutor accepted the panel three times, including Mr. K., and exercised six peremptory challenges before exercising a peremptory challenge against Mr. K.

..............................................................................................................

Before testimony began on the second day of trial, defense counsel asked the court if he could put the *Wheeler* motion on the record. The court responded that he could "do it at the break." When counsel took the issue up on the break, the following colloquy occurred:

"[DEFENSE COUNSEL]: Judge, when can I put the *Wheeler* motion on the record?

"THE COURT: You keep asking me that.

"[DEFENSE COUNSEL]: I don't want to forget about it and have some appellate lawyer take a bite out of me the size of a T-bone steak, so -

"THE COURT: When we get to it we'll get to it.

"[DEFENSE COUNSEL]: Okay."

During a subsequent break in the proceedings that day, defense counsel stated, "I guess we'll do the *Wheeler* motion later." The court responded, "I guess so. I don't want you to forget it though."

After the prosecutor and the defense rested their cases the following day, the trial court readdressed the *Wheeler* motion. The following dialogue occurred:

"THE COURT: . . . [defense counsel] has been anxious to make a record as it relates to the earlier proceedings, and he made a motion. [¶] You may proceed on that motion. At that time, the Court denied your motion but granted a stay or a matter of taking the matter under submission so that the record could reflect your argument. You may proceed on - - in that regard, [defense counsel].

"[DEFENSE COUNSEL]: This is the *Wheeler* motion?

"THE COURT: That's the only motion I'm aware of.

"[DEFENSE COUNSEL]: Your Honor, the prosecution used the preemptory [sic] challenges to excuse the only two black people from the jury pool. I then made an oral *Wheeler* motion. The Court said that we would take it up at the appropriate time. [¶] The first juror was a black male. My impression was he was probably in his 40's. If I recall correctly, he was an administrator for a school district.

"THE COURT: Yes, sir. He was Juror Number 12.

"[DEFENSE COUNSEL]: Yeah, assistant - - that's correct. He was an assistant principal. His wife was a teacher. I believe he said he had children.

"THE COURT: He is a teacher.

"[DEFENSE COUNSEL]: Well, he's a teacher too. He had prior jury service, has family and friends in law enforcement. I think he dressed appropriately. He was certainly well dressed. [¶] He did not indicate he couldn't be fair. He seemed to be a reasonably good juror. He seemed like he was upper middle class. [¶] . . .

. . . Both jurors were members of the black race. They were the only two blacks in the jury pool. And there's no blacks on the jury right now. And I don't see any valid basis for challenging these people other than because of a specific bias. And on that basis, I would challenge the jury panel."

The court asked the prosecutor whether he wanted to comment on the *Wheeler* motion. The prosecutor explained his use of peremptory challenges on the two jurors as follows:

"[PROSECUTOR]: "Your Honor, just for the record, I think [Mr. K.], the Juror Number 12, the vice principal, was - - . . . [¶] . . . was excused after the lunch break. And after the lunch break Officer Heredia again sat with me at counsel table and informed me that a [Mr. K.] was suing his sergeant, him and his son were suing his sergeant over a civil violation. And I - - based upon the totality

7

of what I saw of [Mr. K.] and the fact that [Mr. K.] could be the same one, I thought that exercising my preemptory [sic] challenge would be appropriate.
............................................................................................................................
Both counsel submitted the matter.  The court denied the *Wheeler* motion, explaining: "I don't think there was an appropriate showing that there was some improper use of the rights to exercise preemptory [sic] challenges and be discriminatory in that regard by the People.  Therefore, your motion is denied."

............................................................................................................................
We first address [Petitioner's] contention that his conviction must be reversed because the court summarily denied his *Wheeler* motion when he first raised it during voir dire.  The Attorney General concedes the court erred when it failed to allow [Petitioner] the opportunity to state the basis of the motion when first raised, but contends the error was remedied when the court finally entertained the motion and denied it on its merits.  We need not decide whether the court erred in summarily denying the motion because, even if it did, we agree with the Attorney General that the error was corrected when the court eventually held a hearing on the *Wheeler* motion.  If it is proper for an appellate court to remand for a further hearing on a *Wheeler* motion when the trial court has refused to consider a *Wheeler* challenge, it certainly is not reversible error when a trial court initially fails to fully consider the motion, but then later holds a hearing on it. (See, e.g., *People v. Williams* (2000) 78 Cal.App.4th 1118, 1126 [limited remand applied to error under *Wheeler*]; *People v. Garcia* (2000) 77 Cal.APp.4th 1269, 1281-1282 [same]; *People v. Gore* (1993) 18 Cal.App.4th 692, 707 [same].) [Petitioner] does not contend otherwise.
Turning to the hearing the trial court ultimately held, the Attorney General concedes the trial court impliedly found [Petitioner] made a prima facie showing of the presence of purposeful discrimination (step one), and [Petitioner] does not dispute that the prosecutor provided facially race-neutral justifications for his peremptory challenges to the two African-American prospective jurors (step two). (*Purkett v. Elem*, *supra*, 514 U.S. at pp. 767-768.)  Thus, the disputed issue is whether [Petitioner] proved purposeful discrimination, which required the trial court to examine the persuasiveness of the prosecutor's justifications (step three). (*Miller-El*, *supra*, 537 U.S. at pp. 338-339.) [Petitioner] contends the trial court did not fully comply with this part of its duty because it failed to engage in a serious and reasoned assessment of the prosecutor's race neutral explanation of his peremptory challenge of Mr. K.[footnote]
On the merits, the trial court's determination of the persuasiveness of the prosecution's justifications for its peremptory challenges centers on its evaluation of the prosecutor's credibility in advancing them. (*Miller-El*, *supra*, 537 U.S. at p. 339.)  Accordingly, our standard of review of the trial court's determination of the absence of discriminatory intent is very deferential. (*Id*. at pp. 339-340; *Batson*, *supra*, 476 U.S. at p.98, fn. 21.)  On direct review of a state court judgment, the United States Supreme Court will not overturn a state trial court's finding on the issue of discriminatory intent on a *Batson* motion unless the determination was "clearly erroneous." (*Hernandez v. New York* (1991) 500 U.S. 352, 369 (plur. opn. of Kennedy, J); id. at p. 372 (conc. opn. of O'Connor, J.).) The California appellate courts apply a similar standard of review under *Wheeler*, and defer to the trial court's finding of lack of purposeful discrimination if supported by substantial evidence. (*People v. Alvarez* (1996) 14 Cal.4th 155, 196-197.)
Here, the prosecutor's race-neutral rationale for his challenge to Mr. K. appears reasonable on its face, and is supported by the record of the juror's voir dire examination.  The prosecutor accepted Mr. K. as a juror three times and exercised six peremptory challenges against other jurors before a lunch break

8

during voir dire. It was only after the lunch break that the prosecutor exercised his seventh peremptory challenge against Mr. K. As the prosecutor explained during the Wheeler motion, it was after the lunch break that Officer Heredia, who was sitting with him at the counsel table, informed him that someone with the same name as Mr. K., and that person's son, was suing his sergeant over a "civil violation." The prosecutor thought Mr. K. could be the same person, so he exercised his peremptory challenge against him. Complaints of police harassment or prior arrests are sufficient grounds to justify use of a peremptory challenge. (See, e.g., *Wheeler*, *supra*, 22 Cal.3d at p. 275 [a prosecutor may fear bias based on prior arrests or complaints of police harassment].)

We recognize that a trial court must make "a sincere and reasoned attempt" to evaluate the explanations for a peremptory challenge that a prosecutor gives in response to a *Batson/Wheeler* motion. (*People v. Silva* (2001) 25 Cal.4th 345, 385-386; see also *People v. Fuentes* (1991) 54 Cal.3d 707, 718-720.) But "[w]hen the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings." (*People v. Silva*, *supra*, 25 Cal.4th at p. 386; accord, *People v. Reynoso*, *supra*, 31 Cal.4th at p. 923.)

[Petitioner] contends the record does not support the prosecutor's rationale because Mr. K. never said he had any children. While the prosecutor did state that the lawsuit was brought by someone with Mr. K.'s name and his son, the fact that Mr. K. never said he had children does not mean the prosecutor's reason was not supported by the record because Mr. K. was never asked whether he had children. The prosecutor did not state he was certain Mr. K. was the same person in the lawsuit; he stated he thought he could be the same person since they had the same name. There is nothing in the record to contradict this conclusion. Although it is not clear from the record what the prosecutor meant by "based upon the totality of what I saw of [Mr. K.]," it is clear that the prosecutor excused Mr. K. based on the possibility that he was the person who brought the lawsuit.[8]

In addition, we note the prosecutor passed and accepted the jury three times with Mr. K. as a prospective juror. As our Supreme Court has explained, "[a]lthough not a conclusive factor, 'the passing of certain jurors may be an indication of the prosecutor's good faith in exercising his peremptories, and may be an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection. . . .' [Citation.]" (*People v. Reynoso*, *supra*, 31 Cal.4th at p. 926.) If the prosecutor's reasons for excusing Mr. K. were pretextual and he was determined to remove him from the jury because he was African-American, his acceptance of the jury three times with him seated in the jury box is hardly indicative of discriminatory intent. (*Ibid*.)

In this case, the prosecutor's stated rationale as to Mr. K. was neither contradicted by the record nor inherently implausible. [footnote] Thus, we do not believe that the trial court was required to conduct any further inquiry before accepting it or to make more explicit findings regarding its sincerity and legitimacy. (See *People v. Reynoso*, *supra*, 31 Cal.4th at p. 924 ["All that matters

---

[8] While [Petitioner] contends the prosecutor should have questioned Mr. K. further to verify whether he was the person who brought the lawsuit, questioning of Mr. K. had ended long before the prosecutor learned about the lawsuit. [Petitioner] does not cite any authority supporting the proposition that the prosecutor was required to request the court to allow him to reopen questioning of Mr. K. in order to verify his suspicion before he could exercise his peremptory challenge. We are mindful that the issue here is not whether the prosecutor's suspicion was right or objectively reasonable; it is whether the prosecutor's suspicion is genuine. (*People v. Reynoso*, *supra*, 31 Cal.4th at p. 924 ["The proper focus of a *Batson/Wheeler* inquiry, of course, is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons. [Citation.]"].)

> is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory."].)
> Accordingly, we find no *Wheeler* error.

(Lodged Doc. No. 4, Opinion, at 6-14.) The California Supreme Court denied the petition for review without comment. (Lodged Doc. No. 5.) Accordingly, this Court "looks through" the California Supreme Court's decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal and state trials is governed by the standard established by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 89 (1986). In Batson, the United States Supreme Court set out a three-step process in the trial court to determine whether a peremptory challenge is race-based in violation of the Equal Protection Clause. Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769 (1995). First, the defendant must make a *prima facie* showing that the prosecutor has exercised a peremptory challenge on the basis of race. Id. That is, the defendant must demonstrate that the facts and circumstances of the case "raise an inference" that the prosecution has excluded venire members from the petit jury on account of their race. Id.

If a defendant makes this showing, the burden then shifts to the prosecution to provide a race-neutral explanation for its challenge. Id. At this step, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859 (1991). Finally, the trial court must determine if the defendant has proven purposeful discrimination. Id. at 359. The Supreme Court has made clear that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the

opponent of the strike." Purkett v. Elem, 514 U.S. 765, 768 (1995); Rice v. Collins, 546 U.S. 333, 126 S.Ct. 969, 974 (2006).

"When there is reason to believe that there is a racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it." Johnson v. Vasquez, 3 F.3d 1327, 1331 (9th Cir. 1993). The court must consider the record as a whole and each explanation in order to determine whether an invidious discriminatory purpose may be inferred from the totality of the relevant facts of the case. Kesser v. Cambra, 465 F.3d 351, 360 (9th Cir. 2006) (citing Hernandez, 500 U.S. at 363.)

The California Supreme Court failed to engage in comparative juror analysis at the time of Petitioner's appeal most likely because California caselaw prohibited courts from applying comparative juror analysis.[9] See People v. Johnson, 47 Cal.3d 1194, 1220-23 (1986); People v. Turner, 8 Cal.4th 137, 169 (1994). However, subsequent federal decisions are to the contrary. For the following reasons, under current Circuit authority, this Court must conclude that the state courts' failure to conduct such analysis, even if only to find not beneficial in this instance, was an unreasonable application and contrary to clearly established federal law.

The California Supreme Court's decision was issued prior to the United States Supreme Court's decision in Miller-El v. Dretke, 545 U.S. 231, dated June 13, 2005. There, the defendant was tried for capital murder. The prosecution exercised peremptory strikes against ten out of eleven prospective African-American jurors. Id. at 233. Over defendant's objection that the strikes were improperly based on race, the trial court denied the motion and he was sentenced to death for murder.[10]

---

[9] As Respondent notes, the California Supreme Court is reviewing the propriety of using comparative juror analysis for the first time on appeal in People v. Lenix, S148029, rev. granted January 24, 2007.

[10] The case has a rather lengthy procedural history. While the direct appeal was pending before the state appellate court, the United States Supreme Court decided Batson, which resulted in the case being remanded to the Texas trial court for application of the law as established in Batson, i.e. whether defendant could prove that the jurors were struck based on race. The trial court denied relief finding that the prosecution's reasons were race-neutral.

Defendant then sought habeas corpus relief in the federal district court, which was denied, and the Fifth Circuit Court of Appeals denied a request for a certificate of appealability. The Supreme Court reversed the Fifth

In addressing the merits of the petition, the Supreme Court found that the prosecution had engaged in racial discrimination by using the peremptory challenges to excuse ten out of the eleven African-American jurors. In making its finding, the Court utilized comparative juror analysis despite having been done so by state appellate courts to determine whether the use of the strikes were motivated by race. Id. at 239-262. In Kesser, the Ninth Circuit applied comparative analysis for the first time on appeal stating that the California Court of Appeal failed "to consider comparative evidence in the record before it [which] undeniably contradicted the prosecutor's purported motivations, [and] unreasonably accepted his nonracial motives as genuine." 465 F.3d at 357. In applying comparative analysis, the Ninth Circuit held that "comparative analysis is required even when it is not requested or attempted in state court." Id. at 361. It went on to state that

> The [Supreme] Court in *Miller-El* applied comparative juror analysis to a case originally tried in 1986, remanded for a Batson hearing in 1988, and appealed under AEDPA in 2000. The Court's holding means that the principles expounded in *Miller-El* were clearly established Supreme Court law for AEDPA purposes at least by the time of the last reasoned state court decision in *Miller-El*, handed down in 1992, before Kesser's 1993 trial.

Id. at 360.[11]

Although the state court did not engage in comparative analysis, in this instance, this does not in and of itself warrant relief in the action. Rather, the United States Supreme Court has recently confirmed that "when a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law," this Court "must then resolve the claim without the deference that AEDPA otherwise requires." Panetti v. Quarterman, __ U.S. __, 127 S.Ct. 2842, 2858 (June 28, 2007). Thus, this Court simply reviews the claim *de novo* to determine whether Petitioner has established purposeful discrimination at step three of Batson. See id. Although the state court did not engage in comparative analysis at the time of

---

Circuit's denial of a certificate of appealability, and remanded the case back for review on the merits. 537 U.S. 322, 348 (2003).
    The Fifth Circuit Court of Appeals denied the petition on the merits, and the Supreme Court granted certiorari and issued the most recent decision on June 13, 2005. 545 U.S. 231.

    [11] In Boyd v. Newland, the Ninth Circuit Court of Appeals rejected the argument that Miller-El was not retroactive. 467 F.3d 1139, 1145-1146 (9th Cir. 2006).

12

1  Petitioner's appeal, this Court is presently bound by Ninth Circuit's interpretation of Supreme
2  Court authority to conduct such analysis.[12]
3       First, with regard to Petitioner's claim that the trial court erred in failing to allow him the
4  opportunity to make a prima facie case when the motion was initially made and delayed ruling on
5  the motion until the close of the evidence, the state courts' determination of this issue is not
6  contrary to, or an unreasonable application of Supreme Court authority.  As stated by the Court
7  of Appeal, although it may have been error for the trial court to delay ruling on the motion, such
8  error was adequately remedied when the court conducted the hearing on the Wheeler motion,
9  prior to the jury's rendering of a verdict.  The Court of Appeal recognized that "[i]f it is proper
10 for an appellate court to remand for a further hearing on a Wheeler motion when the trial court
11 has refused to consider a Wheeler challenge, it certainly is not reversible error when a trial court
12 initially fails to fully consider the motion, but then later holds a hearing on it." (Lodged Doc. No.
13 4, Opinion, at 11.)  In addition, and of more importance, for the reasons explained *infra*, because
14 there is no basis to warrant relief under § 2254, any error in this instance was harmless.
15 Consequently, although the trial court's delay in resolving the Wheeler motion was less than
16 ideal, it cannot be said to have been contrary to, or an unreasonable application of Supreme Court
17 authority, and this claim should be denied.
18      Turning to Petitioner's claim that the trial court failed to inquire into the prosecutor's
19 explanation for the dismissal of Mr. Kelly, as noted by the Court of Appeal, Mr. Kelly stated that
20 he was an assistant principal at an elementary school and his wife was a school teacher.  (RTV
21 73.)[13]  He served as a juror two years prior in a criminal trial and there was nothing negative
22 about that experience that would impact his ability in the present case.  (RTV 75-77.)  Mr. Kelly
23 noted that he had family friends in law enforcement.  (RTV 73-74.)
24      During the hearing on the Batson motion, defense counsel argued that Mr. Kelly indicated

---

[12] Ninth Circuit authority is binding on the United States District Court in the Eastern District of California. See Hart v. Massanari, 266 F.3d 1155, 1172 (9th Cir. 2001) ("an opinion of our circuit is binding within our circuit.")

[13] "RT" and "RTV" refer respectively to the Reporter's Trial Transcript and the Reporter's Transcript of Voir Dire lodged with this Court.

that he could be fair and he seemed to be a reasonably good juror. (RT 283.)  In response, the prosecutor stated that Mr. Kelly was only excused after the lunch break and after Officer Heredia informed him that his sergeant was being sued by an individual and his son with the last name Kelly regarding a civil violation. (RT 285.)  The trial court denied the motion stating that there was not "an appropriate showing that there was some improper use of the rights to exercise peremptory challenges and be discriminatory in that regard by the People."  (RT 286.)

There is no dispute that the only issue in this case is the trial court's analysis under step three of the Batson challenge. (Lodged Doc. No. 4, Opinion, at 11.)  The prosecutor's stated reason for excusing Mr. Kelly was facially race-neutral and supported by the record.  Hernandez v. New York, 500 U.S. at 360.

The process of comparative analysis involves determining whether non-challenged jurors possessed any of the same characteristics upon which the prosecution challenged jurors in the protected group, to assist in determining whether discrimination has been proven at the third Batson step. Miller-El v. Dretke, 545 U.S. at 242-243; Kesser v. Cambra, 465 F.3d at 360; United States v. You, 382 F.3d 958, 968-969 (9th Cir. 2004).  Applying comparative analysis is not particularly beneficial in the instant case, as the reason for the dismissal was isolated and unique to only Mr. Kelly.  As noted by the Court of Appeal, although Mr. Kelly did not indicate and was not specifically asked whether he had any children, there is no evidence that he did not have children.[14]  In addition, there is no evidence in the record which provides a reason to doubt the sincerity of the prosecution's subjective belief that Mr. Kelly could have been the same person that Officer Heredia indicated was possibly suing his sergeant on behalf of himself and his son.   As Respondent submits, and although not a conclusive factor, the prosecutor's reason is supported by the record because the prosecution accepted the jury panel with Mr. Kelly four times, and it was only after the lunch break that the prosecutor exercised a peremptory challenge

---

[14] In fact, none of the jurors were asked or indicated whether they had any children, unless such information was relevant and in response to another question posed by the court or counsel.  (See RTV, in general.)

14

against him.[15]  (See RTV 117-124.)  Here, there is simply no evidence that any of the other jurors were possibly suing the investigating agency.  As such, there are no other similarly-situated jurors to compare to Mr. Kelly.  Although the prosecution dismissed both African-American jurors from the jury, and the jury panel did not consist of any African-American jurors, this, alone, is insufficient to rise to the level of demonstrating purposeful discrimination based on racial bias or pretext.  In sum, Petitioner has not met his burden under step-three of Batson, and the claim does not have merit.

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.  The instant petition for writ of habeas corpus be DENIED; and,

2.  The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **fifteen (15)** days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:  **March 3, 2008**              /s/ Dennis L. Beck
                                       UNITED STATES MAGISTRATE JUDGE

---

[15] As Respondent notes the Court of Appeal (Lodged Doc. No. 4, Opinion, at 12), and Respondent (Lodged Doc. No. 2, Respondent's State Court Brief, at 6) mistakenly believed the prosecutor accepted the panel three times with Mr. Kelly on it.  In fact, after further review of the voir dire transcript, the prosecutor accepted the panel and Mr. Kelly *four* times.  (See RTV 81, 85, 88, 94.)